In re NEWBRIDGE NETWORKS
SECURITIES LITIGATION.

This Document Relates to: All Actions.

Civil Action No. 94–1678–LFO.

United States District Court,
District of Columbia.

June 3, 1996.

Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Liaison Counsel, Lawrence A. Sucharow, Goodkind Labaton Rudoff & Sucharow, New York City, Co-lead Counsel, for plaintiffs.

Hunton & Williams, Christopher M. Mason, New York City (James E. Farnham, of counsel), for Defendants Newbridge Networks Corporation, Terence H. Matthews, Peter Sommerer, and Peter D. Charbonneau.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiffs are stockholders and former stockholders of defendant Newbridge Networks Corp. ("Newbridge"). These seven different class action cases have been consolidated into this one class action, reiterated in the First Amended Consolidated Complaint which they filed on May 8, 1995. Newbridge is a Canadian corporation that designs, makes, and markets integrated digital networking products for global networking applications, including ATM systems used by banks. The amended complaint names as individual defendants Newbridge's "controlling persons": its founder, Chairman of the Board, and CEO, Terence H. Matthews; its President, COO, and a director, Peter Sommerer; and its Executive Vice–President, Finance, and CFO, Peter D. Charbonneau.

Plaintiffs allege that defendants issued false and misleading statements concerning the business condition and earnings prospects of Newbridge. They further assert that they lost money as a result of purchasing Newbridge stock because defendants failed to disclose substantial expenses and decreased profit margins. Plaintiffs seek damages in three counts: (1) a claim for "fraud on the market" against all defendants pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(a), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5; (2) a claim for "controlling person" liability against the individual defendants pursuant to § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a); and (3) a common-law claim for "negligent misrepresentation."

A hearing was held on defendants' motion to dismiss on December 11, 1995. The issue is joined by defendants' motion to dismiss and plaintiffs' pending motion for class certification. Also pending are defendants' motion for an order pursuant to Federal Rules of Civil Procedure 26(c), 26(d), 26(g)(3), and 37(a)(4) and plaintiff's cross-motion to compel discovery pursuant to Federal Rules 30 and 37(a)(2).

### I.

Plaintiffs allege that "[p]rior to and during the Class Period, defendants publicly disseminated a series of highly optimistic statements concerning Newbridge's business, operations and profitability that were materially false and misleading." Amended Compl. ¶ 2. Plaintiffs' allegations, which are presumed to be true for purposes of defendants' motion to dismiss, may fairly be summarized as follows.

The amended complaint states that "defendants used communications with securities analysts to promote the Company and to artificially inflate the price of Newbridge stock during the class period." *Id.* ¶ 32. Newbridge officers and top managers regularly communicated with such analysts; "the investment firm S.G. Warburg & Co. Inc., specifically represented in a June 10, 1994, analyst report concerning Newbridge that it had received 'company guidance' from Newbridge with regard to anticipated revenues and other business matters." *Id.* ¶ 34. Communications with analysts took the form of conference calls, meetings, and analyst briefings with company officials. *Id.* ¶ 35. "Newbridge also endorsed the reports of analysts, adopted them as its own, and placed its imprimatur on them as well as on the projections, forecasts, and statements contained therein...." *Id.*

One specific allegation involved company statements that on February 14, 1994, prior to the beginning of the class period, defendants announced—presumably in a press release, although the amended complaint does not so specify—that GTE Telephone Operations had selected Newbridge to provide its 36150 MainStreet ATMnet switching equipment for several "key" networks. *Id.* ¶ 45. A February 15, 1994 press release announced "a marketing alliance the Company had entered into with MCI and additional investments Newbridge had made in certain affiliated companies, including ACC, a maker of local area network bridges and routers." *Id.* That release quoted defendant Matthews as stating that he was "pleased with progress made during the quarter to enter joint development programs with third parties." *Id.* Following such statements, analysts themselves disseminated positive appraisals of Newbridge. *Id.* ¶ 46.

On March 29, 1994, the first day of the class period, Newbridge hosted a securities analyst meeting in New York that was attended by "one or more of the Individual Defendants." *Id.* ¶ 48. At that meeting, "defendants told the attending analysts, among other things, that Newbridge would experience 'no significant deterioration in its current profit margins'; that demand in the carrier market for the Company's ATM switch 'outpaced expectations'; and that the Company had been awarded a $65 million contract to supply networking equipment to a German telecommunications company and also a contract to provide products to a Venezualan company, which contracts, according to a Smith Barney report dated March 30, 1994, 'further increase our confidence in FY94 and FY95 estimates.'" *Id.* ¶ 49 (citations to March 30, 1994 CS First Boston analyst report omitted). Another analyst re-

port following the March 29, 1994 meeting stated that "the company reiterated," among other things, that it was " 'well positioned to sell ATM systems to the telcos and to corporations.' " *Id.* ¶ 50 (quoting March 30, 1994 S.G. Warburg analyst report).

Defendants Sommerer, Charbonneau, and Rodgers, as well as several other Newbridge officers and directors who are not named as defendants, sold substantial numbers of shares within two weeks of the March 29, 1994 analyst meeting and realized considerable profits from those sales. *Id.* ¶ 51. Defendant Charbonneau sold *all* of his shares during this period. *Id.*

Plaintiffs contend that defendants did not disclose "the significant marketing and advertising expenses the Company would and ultimately did incur in connection with" trade shows during the first week of May 1994, despite their knowledge that such expenses "would adversely impact Newbridge's first fiscal quarter for the period ending July 30, 1994." *Id.* ¶ 52. Defendants used the trade shows to "hype Newbridge's product lines and also publicly announce a joint venture relationship between Newbridge and Ungermann–Bass, Inc." *Id.* A May 4, 1994 press release, which quoted defendant Sommerer, made optimistic statements with respect to that joint venture. *Id.*

At a June 6, 1994 analyst meeting in New York, "attended by one or more of the Individual Defendants and other Newbridge executives," defendants made optimistic statements about a particular family of ATM networking equipment, the "VIVID" product. *Id.* ¶ 53.

Also in early June 1994, defendants announced results for Newbridge's fiscal fourth quarter and full year ending April 30, 1994. Defendants did not disclose existing business and operational problems; instead, "defendant Matthews referenced in the Company's June 8, 1994 press release the '*substantial contracts* being secured with customers throughout the world'; the '*strong acceptance* of the Newbridge packet switching products'; the fact that Newbridge's ATM product line 'is attracting *increasing interest with the rate of order intake growing as the year progressed*;' and the May 1994 trade

shows." *Id.* ¶ 54. With these statements before them, analysts issued highly favorable reports about the company. *Id.* ¶ 55 (citing reports). Defendants issued several press releases during the month following June 8, 1994, which described "various contracts, agreements and joint ventures Newbridge had recently entered into." *Id.* ¶ 56 (citing press releases).

On July 1, 1994, defendants filed with the SEC Newbridge's Form 10–K for the fiscal year ending April 30, 1994. Each of the individual defendants signed the 10–K, which "described the Company's business and operations only in the most glowing and superlative terms." *Id.* ¶ 57. The 10–K made representations with respect to Newbridge's product lines, business strategy, research and development activities, customer service and support, and manufacturing processes. With respect to the company's manufacturing processes, the 10–K specifically stated that " '[t]o date, Newbridge has not experienced any significant delays relating to the availability of materials.' " *Id.*

A July 12, 1994 article in *The Financial Post* concerning Newbridge's July 11, 1994 announcement of a planned share repurchase quoted Sandra Plumbley, a Newbridge spokesperson, as stating that "[n]othing has changed in our fundamentals ... There have been times when the stock is just too good to invest. ... [The share repurchase] has an anti-dilutive effect. It means earnings per share would go up." *Id.* ¶ 59. Plaintiffs contend that despite Plumbley's representations, the "fundamentals" had changed as a result of declining earnings, order and shipment delays, increased expenses, and "other adverse business conditions." *Id.* Two Newbridge executives not named as individual defendants sold many of their shares within one week of the July 11, 1994 announcement "(and only two weeks *before* the price of the shares plummeted on August 1, 1994)." *Id.* ¶ 60.

On August 1, 1994, Newbridge announced that earnings per share for the first quarter of fiscal year 1995, ending July 30, 1994, would decline, and thereafter the price of common shares "plummeted, from $41 to

"$28⅝ per share." *Id.* ¶ 61. Several press reports following the announcement noted that members of the press were "caught off guard" and critical of Newbridge for its perceived non-disclosure of negative information. *Id.* ¶¶ 62–64.

Plaintiffs contend that defendants failed to disclose material information with respect to optimistic statements voluntarily made during the class period. Defendants did not disclose that:

(i) the Company was experiencing long delays in closing several multi-million dollar contracts, which delays were adversely impacting Newbridge's revenues; (ii) several large and important customers were unable to secure financing for their purchase of certain Newbridge products, which likewise was adversely impacting Newbridge's revenues; (iii) Newbridge was not shipping products to certain customers because of a lack of parts in Newbridge's inventory; and (iv) the Company's research and development expenses were actually increasing as a percentage of sales, contrary to all prior trends, which was for such expenses to be declining as a percentage of sales.

*Id.* ¶ 5; *see also id.* ¶ 69. Plaintiffs do not specifically identify which contracts defendants were having difficulty closing, but note that the identity of those contracts, some of which were with unspecified companies in Latin America, "is particularly within defendants' knowledge." *Id.* ¶ 69. Plaintiffs do claim that "Newbridge was unable to ship several ... contracts ... in complete form because Newbridge lacked the right mix of parts in its inventory." *Id.* This claim, if proved, would belie defendants' earlier representation in its 10–K that Newbridge had not experienced delays relating to the availability of materials. *Id.* According to plaintiffs, other contracts were not shipped because Newbridge had difficulty obtaining financing guarantees. *Id.*

Moreover, sales in Newbridge's T–1 multiplexer product line were flat or declining, in contrast with prior reporting periods. Similarly, defendants failed to disclose that the company was experiencing increased research and development expenditures (in contrast with representations in the 10–K),

increased promotional expenses as a result of 1994 trade shows, and increased expenses "as a result of the consolidation of ACC's results with the Company's results effective June 8, 1995 [sic], when Newbridge acquired a controlling 51% interest in the company." *Id.* Finally, defendants did not disclose "existing and serious structural deficiencies in the Company's 36150 ATMnet switch" which "placed Newbridge at a serious disadvantage to competitors such as General DataComm Industries, which secured several lucrative ATM equipment contracts with major telecommunications carriers including MCI Communications Corporation." *Id.*

## II.

Our Court of Appeals recently stated that a motion to dismiss should not be granted "unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir. 1994). While plaintiffs are granted the benefit of all inferences that can be derived from the facts alleged, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Id.*

## III.

Defendants have moved to dismiss the amended complaint without leave to replead. Defendants contend that the complaint fails to state a claim for securities fraud under Federal Rule of Civil Procedure 12(b)(6). According to defendants, plaintiffs have not alleged securities fraud; instead, plaintiffs have "alleged only the Defendants made projections that missed the mark." Mot. to Dismiss at 10. Defendants also argue that plaintiffs have not pleaded any allegations of fraud with the particularity required by Federal Rule of Civil Procedure 9(b). *See id.* at 9 (citing *Kowal v. MCI Communications Corp.*, 16 F.3d 1271 (D.C.Cir.1994)).

## A.

SEC Rule 10b–5 provides that it is unlawful "[t]o make any untrue statement of a

material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Our Court of Appeals has held that "[t]o state a claim for securities fraud under Rule 10b–5, a plaintiff must allege that the defendant knowingly or recklessly made a false or misleading statement of material fact in connection with the purchase or sale of a security, upon which plaintiff reasonably relied, proximately causing his injury." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994) (footnote omitted). Defendants argue that the amended complaint fails to state a claim of securities fraud because plaintiffs' allegations concern merely opinions or projections. They invoke the observation of the *Kowal* court that "projections are not guarantees of future financial performance, nor are they understood as such by reasonable investors." *Id.* Defendants also argue that plaintiffs' allegations fail to demonstrate that defendants had a duty to disclose any of the alleged omissions.

In dismissing a securities fraud complaint for failure to state a claim, the court in *Kowal* emphasized that "many of plaintiffs' allegations called for pejorative characterizations of disclosed factual matters." *Kowal*, 16 F.3d at 1277. With respect to the allegedly material omissions, the *Kowal* court approved the district court's view that "much of the information allegedly omitted as negative characterizations of disclosed corporate events, general industry conditions, or the activities of [defendant's] competitors." *Id.* at 1275. Moreover, several of the alleged omissions were quite general statements about the company's health; for example, the *Kowal* defendants did not disclose "that MCI's increased expenditures on sales and marketing were inadequate to maintain its prior revenue and market share growth rate" or "that MCI's cumbersome management structure was impeding its ability to react timely and effectively to changes in competitive conditions, and MCI would soon need to engage in a costly restructuring of its operations." *Id.* With respect to allegations that did involve firm-specific information allegedly undisclosed by the defendants, the Court of Appeals held that those allegations were in-

adequately pleaded under Rule 9(b), not that they were insufficient under Rule 12(b)(6). *See, e.g., id.* at 1279 ("The complaint lacks any factual specificity to support the proposition that 'customers are switching [from defendant corporation to competitors], [or] for the proposition that concealment of this information equalled fraud.'").

■ By contrast, plaintiffs in the instant case have alleged more than unrealistic expectations or overly optimistic projections. Instead, they argue that "defendants' omissions of the material problems with the Company's operations operated in tandem with the consistent pattern of optimistic representations to mislead the investing public." Pls.' Opp'n at 18 (citing *Robbins v. Moore Medical Corp.*, 788 F.Supp. 179, 185 (S.D.N.Y. 1992)). A trier of fact could find that several of these omissions bore tangentially, but materially, upon positive statements made by defendants. For example, plaintiffs allege that prior to the beginning of the class period, defendants announced that GTE Telephone Operations had selected Newbridge to provide its 36150 MainStreet ATMnet switching equipment for several "key" networks. Amended Compl. ¶ 45. However, according to plaintiffs, defendants did not disclose "existing and serious structural deficiencies in the Company's 36150 ATMnet switch," which "placed Newbridge at a serious disadvantage to competitors." *Id.* ¶ 69. In addition, as earlier indicated, defendants allegedly made numerous representations with respect to profitable contracts it had secured with several companies. *See, e.g., id.* ¶¶ 49 (contracts with German and Venezualan companies), 54 ("substantial contracts being secured with customers throughout the world"), 56 ("various contracts, agreements and joint ventures Newbridge had recently entered into"). Yet plaintiffs argue that defendants failed to disclose that Newbridge "was experiencing long delays in closing several multi-million dollar contracts, which delays were adversely impacting Newbridge's revenues." *Id.* ¶ 5. Some of those delays are alleged to have resulted from difficulty obtaining financing guarantees. *Id.* ¶ 69. Moreover, Newbridge's 10–K for the period ending April 30, 1994, specifically stated that

" '[t]o date, Newbridge has not experienced any significant delays relating to the availability of materials.' " *Id.* ¶ 57. According to plaintiffs, defendants did not disclose that "Newbridge was unable to ship several ... contracts ... in complete form because Newbridge lacked the right mix of parts in its inventory." *Id.* ¶ 69.[1] Plaintiffs' allegations therefore differ from those dismissed in *Kowal;* instead of merely alleging inaccurate projections or overly positive characterizations of the state of the company, the amended complaint alleges numerous material omissions and factually misleading statements by Newbridge.

■ Despite defendants' suggestion to the contrary, optimistic statements and forecasts, made voluntarily, can trigger a duty to disclose additional information if such information is necessary so as not to mislead the market. The *Kowal* court itself stated that "while a company is generally under no obligation to disclose its expectations for the future to the investing public, ... if the company chooses to volunteer such information, its disclosure must be full and fair, and the courts may conclude that the company was obliged 'to disclose additional material facts ... to the extent that the volunteered disclosure was misleading....' " *Kowal,* 16 F.3d at 1277 (citations omitted). "[P]rojections and statements of optimism are false and misleading for the purposes of the securities laws if they were issued without good faith or lacked a reasonable basis when made." *Id.* Implicit in the amended complaint is plaintiffs' contention that, in light of the alleged omissions from defendants' optimistic statements, those statements were not *in good faith* and *were known by defendants* to lack a reasonable basis. Plaintiffs do not argue that defendants' statements were false; instead, plaintiffs argue that the statements were so incomplete as to be misleading. That argument raises questions for the finder of fact that may not be resolved by a motion to dismiss.

■ Several of plaintiffs' factual allegations present more difficult questions under *Kowal* insofar as they are not correlated with any particular omissions. For example, on March 29, 1994, Newbridge hosted a securities analyst meeting in New York, attended by "one or more of the Individual Defendants," at which "defendants told the attending analysts, among other things, that Newbridge would experience 'no significant deterioration in its current profit margins'; that demand in the carrier market for the Company's ATM switch 'outpaced expectations'; and 'further increase our confidence in FY94 and FY95 estimates.' " *Id.* ¶¶ 48–49 (citations to March 30, 1994 CS First Boston analyst report omitted). Similarly, defendants did not disclose "the significant marketing and advertising expenses the Company would and ultimately did incur in connection with" trade shows during the first week of May 1994, despite their knowledge that such expenses "would adversely impact Newbridge's first fiscal quarter for the period ending July 30, 1994." *Id.* ¶ 52. In addition, a July 12, 1994 article in *The Financial Post* concerning Newbridge's July 11, 1994 announcement of a planned share repurchase quoted Sandra Plumbley, a Newbridge spokesperson, as stating that " '[n]othing' has changed in our fundamentals." *Id.* ¶ 59. Plaintiffs contend that despite that representation, the "fundamentals" *had* changed as a result of declining earnings, order and shipment delays, increased expenses, and "other adverse business conditions." *Id.* These allegations may be insufficient to establish that defendants had a duty to disclose such negative, firm-specific information. However, "[w]hether failure to disclose company problems is an omission causing statements to be misleading is now a factual determination left to the jury." *Alfus v. Pyramid Technology Corp.,* 764 F.Supp. 598, 603 (N.D.Cal. 1991) (citing *Marx v. Computer Sciences Corp.,* 507 F.2d 485, 492 (9th Cir.1974)). Plaintiffs' allegations, if true, may render defendants' alleged representations material-

---

1. Plaintiffs do not specifically identify those contracts in the amended complaint. However, the adequacy of plaintiffs' allegations is a question to be resolved with respect to Federal Rule of Civil Procedure 9(b), not Rule 12(b)(6). Accordingly, the adequacy of plaintiffs' allegations about Newbridge contracts will be addressed in the context of Rule 9(b).

ly misleading, and therefore actionable under the securities laws. Accordingly, assuming *arguendo* that plaintiffs' allegations satisfy the requirements of Federal Rule of Civil Procedure 9(b), it would be inappropriate at this stage of the litigation to grant defendants' motion to dismiss for failure to state a claim.

## B.

■ Federal Rule of Civil Procedure 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud ... shall be stated with particularity." Our Court of Appeals has explained that in their pleadings, securities fraud plaintiffs "must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Kowal*, 16 F.3d at 1278 (internal quotation marks and citation omitted). In addition, "where plaintiffs seek to base a claim of securities fraud on false and misleading projections or statements of optimism, their complaint must also plead sufficient facts that if true would substantiate the charge that the company lacked a reasonable basis for its projections or issued them in less than good faith." *Id.*

■ First, plaintiffs allege that numerous analysts' reports evidence defendants' misrepresentations and material omissions intended to mislead the·market. Defendants argue that plaintiffs have not adequately alleged that any defendant "adopted" any analyst's report so as to make it a statement by the company. *See* Mot. to Dismiss at 13–14 (citing *In re Syntex Corp. Sec. Litig.*, 855 F.Supp. 1086, 1097 (N.D.Cal.1994)). "A company may be liable for analysts' forecasts which it fostered and reviewed but failed to correct if it expressly or impliedly represented that the information was accurate or coincided with the company's views.... Allegations based on this theory of liability must legally support a conclusion that the company adopted, endorsed or sufficiently entangled itself with the forecasts to render them attributable to him." *In re Syntex Corp. Sec. Litig.*, 855 F.Supp. 1086, 1097 (N.D.Cal.1994) (citations omitted).

As earlier indicated, plaintiffs allege that Newbridge officers and top managers regularly communicated with analysts; for example, one investment firm represented that it had received "company guidance" with respect to "anticipated revenues and other business matters." Amended Compl. ¶ 34. Plaintiffs contend that while the amended complaint does satisfy *Syntex*, "what is significant is not whether the defendants endorsed the analysts' forecasts, but that the analyst reports summarized representations provided *by the defendants* to analysts." Pls.' Opp'n at 33. Thus, plaintiffs argue that

> while the Complaint also cites certain projections issued by the analysts, based primarily on the information provided by the Company, the allegations in the Complaint are not based on these projections and the cause of action is not dependent upon these projections having been adopted by defendants. Rather, these projections and optimistic statements by analysts are given as examples of the success of the defendants in their scheme to mislead the market into believing that everything was well with Newbridge.

*Id.* at 35. However, the allegations in the amended complaint are dependent on whether information in the analysts' reports actually originated with defendants and whether those reports fairly represent statements made by defendants. If not, it would be inappropriate to hold defendants liable on the basis of statements made in the analysts' reports. Courts have made clear that the way to determine whether or not defendants should be held liable for such statements is by first determining whether the analysts' reports were endorsed by defendants. *"It is not sufficient to allege that defendants provided analysts with the information on which the analysts' reports were based.* Plaintiffs must also allege that defendants had some measure of control over the content of the final report or projection issued by the analysts.... Analysts might quote corporate spokespersons out of context or inaccurately interpret remarks made by corporate insiders." *In re Gupta Corp. Sec. Litig.*, 900 F.Supp. 1217, 1237 (N.D.Cal.1994) (emphasis added) (citations omitted).

Plaintiffs have alleged that "Newbridge also endorsed the reports of analysts, adopted them as its own, and placed its imprimatur on them as well as on the projections, forecasts, and statements contained therein...." Amended Compl. ¶ 35. Several courts have found that a rather general allegation of endorsement may suffice for purposes of Rule 9(b). *See, e.g., In re Gupta Sec. Litig.,* 900 F.Supp. at 1238 (citing cases). Nevertheless, plaintiffs' conclusory allegation with respect to endorsement is inadequate under Rule 9(b). In *Gupta,* the court stated that "[a]lthough it is a close question, the Court finds that, for now, plaintiffs have met their burden." *Id.* In that case, however, the plaintiffs had specifically alleged that " 'copies of drafts of [analysts'] reports were provided to defendants and other top Gupta officers before they were released, and those drafts were reviewed and approved by them.' " *Id.* at 1237 (quoting complaint). In contrast, plaintiffs in the instant case have not alleged any such post-statement involvement with analysts' reports, and their general, conclusory allegation that Newbridge endorsed analysts' reports is insufficient to pass muster under Rule 9(b). Plaintiffs' allegations with respect to analysts' reports therefore must be dismissed.

Plaintiffs also rely on several Newbridge press releases, Newbridge's Form 10–K, and a newspaper article to show that defendants disseminated misleading statements and failed to disclose material information. Citing *Kowal* and other cases, defendants argue that plaintiffs' allegations with respect to those sources fail to satisfy the requirements of Rule 9(b). In *Kowal,* our Court of Appeals cited with approval the decision of the Seventh Circuit in *Roots Partnership v. Land's End, Inc.:*

> The plaintiffs in *Roots* alleged that the defendants knew or should have known that certain operational problems at the company (including slackening demand, low-margin liquidations and declining profit margins) would preclude the company from achieving its earning goals, and that the company's earnings projections were therefore false and misleading.... [T]he court observed that plaintiffs pled "the existence of these operational problems only in the vaguest terms," alleging, for instance, that the company failed to establish "adequate reserves for its excessive and outdated inventory," but nowhere alleging what the company's reserves actually were, or what they should have been.... The court accordingly concluded that plaintiffs had "failed to allege 'with particularity' ... that these operational problems undercut the reasonableness of defendants' statements such that the failure to mention these problems constituted fraud."

*Id.* at 1278–79 (quoting *Roots Partnership v. Land's End, Inc.,* 965 F.2d 1411, 1419 (7th Cir.1992)). The *Kowal* court specifically rejected one allegation as inadequate under Rule 9(b) because it "lack[ed] any factual specificity to support the proposition that 'customers were switching ...' and plaintiffs' pleadings on information and belief did not aver that facts regarding customer switching were particularly within the defendants' knowledge, or identify the facts upon which their belief of customer switching was founded." *Id.* at 1279. The court also noted that "pleadings on information and belief require an allegation that the necessary information lies within the defendant's control, and that such allegations must also be accompanied by a statement of the facts upon which the allegations are based." *Id.* at 1279 n. 3; *see also J/H Real Estate Inc. v. Abramson,* 901 F.Supp. 952, 957 (E.D.Pa.1995).

Several of plaintiffs' allegations are specific enough to survive scrutiny under Rule 9(b). For example, plaintiffs argue that defendants should have disclosed "existing and serious structural deficiencies in the Company's 36150 ATMnet switch" in light of Newbridge's initial announcement that "GTE Telephone Operations had selected Newbridge to provide" that switch for several "key" networks. *Id.* ¶¶ 45, 69. In addition, although defendants made numerous representations with respect to contracts and joint ventures with other companies, and the Newbridge 10–K stated that "Newbridge has not experienced any significant delays relating to the availability of materials," plaintiffs allege that defendants failed to disclose delays in closing and shipping several contracts. *Id.* ¶¶ 5, 54, 56–57, 59, 69. While those contracts

are not specifically identified, plaintiffs do specifically allege that the identity of the contracts Newbridge was unable to ship is "particularly within defendants' knowledge." *Id.* ¶ 69. Moreover, it appears from the Amended Complaint that plaintiffs base their allegation with respect to shipment delays on a statement by Kenneth Wigglesworth, Newbridge's Vice–President of Finance, after the August 1, 1994 announcement of decreased earnings, that Newbridge "was unable to fill some shipments because inventories of certain parts were not available." *Id.* Although it is a close question, plaintiffs satisfy the *Kowal* standard with respect to allegations about undisclosed delays in shipping contracts because of inadequate inventory.

■ However, plaintiffs do not offer any "statement of the facts upon which the allegations are based" with respect to allegations about the inability of "several large and important customers ... to secure financing" for purchases. *Id.* ¶ 5. Plaintiffs allege that "Newbridge was unable to obtain financing guarantees from third-party banks that were necessary to ship the Company's product to those companies." *Id.* ¶ 69. Those companies and banks are not identified, and plaintiffs do not satisfy the *Kowal* standard for pleadings on information and belief. This strict pleading standard under Rule 9(b) is intended to " 'prevent[ ] the filing of a complaint as a pretext for the discovery of unknown wrongs.' " *Kowal,* 16 F.3d at 1279 n. 3 (quoting *Neubronner v. Milken,* 6 F.3d 666, 671 (9th Cir.1993) (citation omitted)). Thus, plaintiffs' argument that their inability to be more specific in their allegations should be excused at this pre-discovery stage of the litigation does not take into account the Court of Appeals' justification for a strict pleading standard under Rule 9(b), that is, to avoid "the discovery of unknown wrongs." Plaintiffs must, in order to satisfy Rule 9(b), either allege additional facts or allege that such facts are within defendants' control and provide a statement of facts on which the allegations are based.

■ Many other allegations raise similar problems under Rule 9(b). For example, plaintiffs allege that sales in Newbridge's T–1 multiplexer product line were flat or declin-ing, in contrast with prior reporting periods, but fail to allege any additional information about the degree to which such sales were flat or declining, or the relevant time period. Similarly, plaintiffs allege that defendants did not disclose various sharply increased expenses. *See* Amended Compl. ¶ 69. Plaintiffs provide no additional information with respect to the degree to which expenses increased or when they increased, or the information on which these allegations are based. Moreover, plaintiffs' allegation that the July 12, 1994 newspaper article should have disclosed "adverse business conditions" is clearly insufficient under Rule 9(b). Our Court of Appeals rejected a similarly vague allegation in *Kowal,* holding that the complaint "lack[ed] any factual specificity to support the proposition that 'customers were switching ...' and plaintiffs' pleadings on information and belief did not aver facts regarding customer switching were particularly within the defendants' knowledge, or identify the facts upon which their belief of customer switching was founded." *Kowal,* 16 F.3d at 1279. Thus, defendants' motion to dismiss must be granted with respect to allegations about defendants' failure to disclose difficulties with financing, flat or declining sales, increased expenses, and other "adverse business conditions."

■ Plaintiffs' allegations, if stated with particularity, would state a claim of securities fraud, despite defendants' argument to the contrary. Thus, this Court will grant leave to amend, as requested by plaintiffs. Where information necessary to support an allegation is particularly within defendants' knowledge, plaintiffs must so state and identify the facts upon which the allegation is founded, as required by *Kowal.*

■ Finally, defendants argue that plaintiffs' allegations with respect to individual defendants' insider trading and, relatedly, defendants' scienter are inadequate under Rule 9(b). Plaintiffs make much of the allegation that several of the individual defendants sold significant percentages of their stock holdings during the relevant period, thereby taking advantage of the allegedly inflated share price. According to plaintiffs,

a duty to disclose arises when corporate executives sell their stock while in possession of non-public information. *See* Pls.' Opp'n at 20 (citing *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir.1987)). As this Court has already determined that plaintiffs' allegations, if adequately pleaded, state a claim for securities fraud, it is unnecessary to resolve the parties' dispute over whether insider trading creates an additional duty to disclose material information. However, plaintiffs also argue that evidence of insider trading supports an inference of scienter. *See* Pls.' Opp'n at 20 n. 5 (citing *In re Apple Computer Sec. Litig.*, 886 F.2d 1109 (9th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990)). Defendants concede that intent and knowledge may be averred generally under Rule 9(b), but argue that "a securities fraud plaintiff must also allege *the circumstances* of that knowledge to satisfy the scienter requirements of federal law.... 'This means the who, what, where, and how....'" Defs.' Reply at 23–24 n. 12 (citation omitted). Insofar as some of plaintiffs' allegations are inadequate under Rule 9(b), scienter has been inadequately alleged. However, "[i]nsider trading in suspicious amounts or at suspicious times is, of course, presumptively probative of bad faith and scienter." *Rubinstein v. Collins*, 20 F.3d 160, 169 (5th Cir.1994). Despite defendants' argument to the contrary, plaintiffs have adequately pleaded insider trading so as to support an inference of scienter. *See* Amended Compl. ¶¶ 51, 60.

## IV.

■ Defendants argue that the amended complaint fails to state a claim of "controlling person" liability under § 20(a) against the individual defendants. Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is ... liable." 15 U.S.C. § 78t(a). "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2. The amended complaint states that the individual defendants controlled Newbridge "[b]y reason of their stock ownership or other financial interests, their business relationships and their status as members of Newbridge's management and/or Board." Amended Compl. ¶ 21. Defendants argue that these general allegations·of the individual defendants' positions are insufficient to plead actual control. *See* Mot. to Dismiss at 48 (citing *In re Cryomedical Sciences, Inc. Sec. Litig.*, 884 F.Supp. 1001, 1020 (D.Md.1995)). Defendants also argue that plaintiffs' failure to specify how much stock the individual defendants actually owned is fatal to the claim. *See id.* (citing *Martin v. EVP Second Corp.*, [1991] Fed.Sec.L.Rep. (CCH) ¶ 96,115 at 90,646 (S.D.N.Y.1991); *Ballan v. Wilfred Am. Educ. Corp.*, 720 F.Supp. 241, 254 (E.D.N.Y.1989)).

The amended complaint alleges that on April 1, 1994, defendant Sommerer sold 70,-000 shares, which was more than half of his common shares. Amended Compl. ¶ 51. Defendant Charbonneau sold all of his 98,850 common shares during two sales in April 1994. *Id.* Plaintiffs therefore effectively provide information as to how much stock these two defendants owned during the Class Period. In addition, defendants Matthews, Sommerer, and Charbonneau each signed Newbridge's July 1, 1994 Form 10–K. *Id.* ¶ 57. Thus, "each moving defendant signed at least one of the SEC filings in which false and misleading statements were made.... This is sufficient, at least at the pleading stage, to create an inference that they had at least a modicum of control over the content of these documents." *In re the Leslie Fay Cos., Inc. Sec. Litig.*, 1993 WL 438927, *5 & n. 11 (S.D.N.Y. Oct. 27, 1993). Furthermore, at least one press release specifically quoted defendant Sommerer, and another quoted defendant Matthews. *See* Amended Compl. ¶¶ 52, 54. These allegations "would seem to tie [the individual defendants] to the fraud itself." *Cammer v. Bloom*, 711 F.Supp. 1264, 1295 (D.N.J.1989), *appeal dismissed*, 993 F.2d 875 (3d Cir.1993). Plaintiffs adequately allege that the fraud was perpetrated through group-published statements, such as press releases, which presumptively reflect

the collective actions of Newbridge's directors and officers. *See Blake v. Dierdorff,* 856 F.2d 1365, 1369 (9th Cir.1988). Finally, "[s]ubstantial weight must be given to the authority, or rather the potential authority, inherent in [defendants'] positions, considered separately or in concert." *In re Meridian Sec. Litig.,* 772 F.Supp. 223, 228 (E.D.Pa. 1991). It would therefore be premature to dismiss plaintiffs' claims against the individual defendants under § 20 at this early stage of the litigation, at least with respect to the few allegations that have not been dismissed under Rule 9(b).

### V.

■ Defendants argue that the amended complaint fails to state a claim of common-law negligent misrepresentation. Plaintiffs do not specify which state's (or states') common law is at issue. However, as one court has observed, "[a]uthorities are divided on whether plaintiffs making common law fraud claims may employ a fraud on the market theory." *Wells v. HBO & Co.,* 813 F.Supp. 1561, 1569 (N.D.Ga.1992) (citing cases). Many jurisdictions require a plaintiff to plead individual reliance with respect to each alleged misrepresentation. *See, e.g., id.* at 1569–70; *Good v. Zenith Electronics Corp.,* 751 F.Supp. 1320, 1323 (N.D.Ill.1990); *Deutschman v. Beneficial Corp.,* 132 F.R.D. 359, 379 (D.Del.1990). It would be inappropriate to resolve the reliance question as to each state whose law might be implicated in this class action, particularly where plaintiffs have not specified any particular state law that governs this case. Nor is a "fraud on the market" theory or a presumption of reliance applicable to this common-law context. Plaintiffs must present individualized, specific allegations of reliance by each plaintiff, and they have not done so in their amended complaint.

Plaintiffs argue that if actual individual reliance must be alleged, the issue should be held "in abeyance for separate trials, following the determination on liability," or plaintiffs should be permitted to "submit appropriate information demonstrating their actual reliance." Pls.' Opp'n at 47. However, defendants correctly argue in their opposition

to plaintiffs' motion for class certification that plaintiffs' common-law claims do not lend themselves to class action treatment because of the potential choice-of-law problems that would make a class action unwieldy. *See J/H Real Estate Inc. v. Abramson,* 1996 WL 63712, *7 (E.D.Pa. Feb. 9, 1996). Accordingly, an accompanying Order will grant defendants' motion to dismiss plaintiffs' common-law negligent misrepresentation claims.

### VI.

Plaintiffs ask that this action be certified on behalf of all persons who purchased the common stock of Newbridge between March 29, 1994, and August 1, 1994, and suffered damage. Defendant Newbridge argues that class certification would be inappropriate because there are insufficient facts to support certification and the proposed class is overbroad.

Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition, one of the three requirements set forth in Rule 23(b) must be satisfied. Plaintiffs claim that, as required by Rule 23(b)(3), they have met their burden of showing that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *See McCarthy v. Kleindienst,* 741 F.2d 1406, 1414 n. 9 (D.C.Cir.1984).

■ Plaintiffs allege that joinder of all members is impracticable. According to plaintiffs, Newbridge has over 80 million shares of common stock outstanding and millions of shares were traded during the Class Period. "While the exact number of class

members is unknown to plaintiffs at the present time and can only be ascertained from books and records maintained by Newbridge and/or its agents, plaintiffs believe that there are thousands of class members." Amended Compl. ¶ 26. Defendants argue that plaintiffs have offered no evidence to supplement their allegations; however, plaintiffs' showing is sufficient at this pre-discovery stage of the litigation, particularly in light of plaintiffs' allegation that additional evidence with respect to numerosity lies within Newbridge's control.

■ Plaintiffs also allege that there was a common course of fraudulent conduct by defendants in connection with material misstatements and omissions in documents and statements publicly disseminated during the class period. Thus, according to plaintiffs, there are questions of law or fact common to all members of the class which predominate over questions affecting only individual members. Defendants again argue that plaintiffs offer no evidence with respect to this conclusory statement. However, it is not clear what evidence plaintiffs could present on the issue of whether there are issues of fact and law common to the class, other than the allegations of securities fraud in the amended complaint. As plaintiffs point out, "courts have widely recognized the utility of, and the necessity for, class actions in securities litigation." Pls.' Mot. at 8 (citing, *inter alia, Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335 (9th Cir.1976); *Foltz v. U.S. News & World Report Inc.,* 111 F.R.D. 49 (D.D.C.1986)). In addition, "where members of a class are subject to the same misrepresentations and omissions, and where alleged misrepresentations fit within a common course of conduct, common questions exist and a class action is appropriate." *In re United Energy Corp. Sec. Litig.,* 122 F.R.D. 251, 254 (C.D.Cal. 1988). Defendants have not argued that there are *not* issues of fact and law common to the class which predominate over individual questions, and a review of the amended complaint supports plaintiffs' position.

■ Defendants do vigorously contest plaintiffs' assertion that plaintiffs' claims are typical of those of the class. In their motion for class certification, plaintiffs represent that they are open-market purchasers of Newbridge shares and were all subject to defendants' alleged common scheme, resulting in their purchase of Newbridge shares at allegedly inflated prices. Plaintiffs argue that the central issues in this case are whether defendants' public disclosures during the class period were materially false and misleading so as to violate the securities laws, and whether those disclosures inflated the market price of Newbridge shares and damaged members of the class. Thus, plaintiffs argue that they have claims that are typical of the class as a whole. However, defendants argue that plaintiffs have made no allegations and presented no evidence as to how or where any of them purchased Newbridge shares. For example, plaintiffs do not say whether they purchased shares through NASDAQ, the Toronto Stock Exchange, or some other exchange, or in a private transaction. Defendants argue that without such information about which market plaintiffs operated within, plaintiffs cannot claim a "fraud on the market" presumption of reliance. *See* Defs.' Opp'n at 10 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 247, 108 S.Ct. 978, 991–92, 99 L.Ed.2d 194 (1988); *Sable v. Southmark/Envicon Capital Corp.,* 819 F.Supp. 324, 339 (S.D.N.Y.1993); *In re LTV Sec. Litig.,* 88 F.R.D. 134, 143 (N.D.Tex. 1980)).

Plaintiffs assert in their motion that they are open market purchasers of Newbridge shares, and the amended complaint alleges that Newbridge stock was traded on NASDAQ. They do not specifically allege that plaintiffs themselves traded the stock on NASDAQ. However, the amended complaint states that "[p]laintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine." Amended Compl. ¶ 30. Here, a trier of fact could reasonably infer from the facts alleged in the amended complaint that plaintiffs did purchase shares of Newbridge on the open market. Moreover, plaintiffs have adequately pleaded that there was an efficient market; plaintiffs allege not only that Newbridge stock was traded on NASDAQ, but also that

Newbridge filed periodic reports with the SEC, had a substantial daily trading volume, and was followed by securities analysts who issued reports on the company. *Id.* Such allegations are sufficient to allege an efficient market. *See, e.g., Hayes v. Gross,* 982 F.2d 104, 107 (3d Cir.1992). While defendants may argue, after discovery, that plaintiffs did not trade on the open market and thus cannot rely on the fraud-on-the-market doctrine to show reliance—so that a class action is inappropriate in this case—plaintiffs have adequately alleged the "typicality" required by Federal Rule of Civil Procedure 23(a)(3).

Plaintiffs argue that they will provide fair and adequate representation on behalf of the class, and that their interests are in harmony with those of the other class members. Plaintiffs represent that their counsel "have extensive experience, are well respected in securities class litigation and have successfully prosecuted numerous securities cases in federal courts throughout the United States." Pls.' Mot. at 18. Defendants do not question the skill of plaintiffs' counsel. Defendants do argue, however, that plaintiffs have not made any specific presentation of evidence showing that they will fairly and adequately protect the interests of the class. For example, plaintiffs have not provided any specific identifying information about themselves that would show that they are appropriate representatives. "[F]acts regarding the personal qualities of the representatives themselves are relevant, indeed necessary, in determining whether 'the representative parties will fairly and adequately protect the interests of the class.'" *In re Goldchip Funding Co.,* 61 F.R.D. 592, 594 (M.D.Pa.1974); *see also Kline v. Wolf,* 702 F.2d 400, 403 (2d Cir. 1983). Defendants note that one named representative, Michael Rapp, may be the same Michael Rapp who was convicted of fraud, and that another named representative, Charles Levine, may be a member of the same household as a Betty Levine who was found to be an inadequate class representative in another suit involving one of plaintiffs' co-lead counsel. Defs.' Opp'n at 13 n. 8. While defendants' suggestion may raise concerns about those plaintiffs' ability to represent the class, it is not at all clear what kind of personal information defendants would have plaintiffs provide at this stage of the litigation in order to show that the class should be certified. If, during discovery, defendants obtain specific information that one or more of the class representatives cannot fairly and adequately represent the interests of the class, defendants may so argue and this Court may reconsider whether class certification is appropriate at that time.

Plaintiffs also do not indicate whether they continue to own Newbridge shares; defendants claim that a sale of shares would place a plaintiff in a different position than a class member who has not sold. Defendants argue that plaintiffs who sold their shares may even have made a substantial overall profit on their shares. One court has held that "[i]f this were the case, the Court could see no basis for allowing that plaintiff to represent a class of purchasers, who allegedly suffered a loss due to their purchase, to sue." *In re AM Int'l, Inc. Sec. Litig.,* 108 F.R.D. 190, 196 n. 9 (S.D.N.Y.1985). However, there is no evidence in the record that one or more named plaintiffs made a substantial profit after selling Newbridge shares. No motion for class certification can be denied on the basis of such speculation. Accordingly, an accompanying Order will deny defendants' motion to refuse class certification, without prejudice to renewal of that motion at the close of discovery.

 Defendants also argue that plaintiffs have not alleged any familiarity with the facts alleged by their counsel, and are therefore inadequate class representatives. Defs.' Opp'n at 15 (citing, *inter alia, In re Storage Technology Corp. Sec. Litig.,* 113 F.R.D. 113, 118–19 (D.Colo.1986)). While it is true that "in complex litigations such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be expected," a "total lack of interest and unfamiliarity with this suit" would be sufficient grounds to deny plaintiffs' motion. *In re AM Int'l Sec. Litig.,* 108 F.R.D. at 196–97. Again, defendants have proffered no evidence that plaintiffs are unfamiliar with the facts alleged by their counsel. Plaintiffs need not allege their familiarity with those facts in

their amended complaint in order to support their motion for class certification. Of course, defendants may renew their argument at a later date if they discover evidence of a "total lack of interest and unfamiliarity with this suit."

■ Plaintiffs next argue that a class action is superior to all other available methods for the fair and efficient adjudication of the controversy. Defendants contend that plaintiffs' allegations are insufficient; for example, plaintiffs claim that a class action is the only viable way to bring this suit because the "typical claims" of class members are "far too small" for individual class members to maintain individual actions, without explaining what a "typical claim" would be. However, plaintiffs have alleged how many shares each purchased, and at what price. *See* Amended Compl. ¶ 12. Thus, defendants have sufficient information about what plaintiffs consider to be "typical claims" in this litigation.

■ Finally, defendants argue that the proposed class is overbroad because the class period extends to August 1, 1994, even though the last named plaintiff to have purchased Newbridge stock (Sang Ki Kim) did so on July 27, 1994. However, courts have held that the named plaintiffs' claims need only be "typical" of those of class members, not identical. For example, in *Alfus v. Pyramid Technology Corp.*, the court held that

> [w]hile the representative must be a member with standing, the Alfus class is not confined to that period preceding Alfus' final purchase of Pyramid stock; carving out such a period would be arbitrary. Reducing the class period according to Alfus' purchase date would imply "that only someone who bought on the last day of a class period would be able to bring an action based on" the logical dates alleged in the Amended Complaint.

*Alfus v. Pyramid Technology Corp.*, 764 F.Supp. 598, 606 (N.D.Cal.1991) (citation omitted). Plaintiffs allege that defendants engaged in a common course of fraudulent conduct throughout the class period, until defendants' announcement on August 1, 1994, that Newbridge's earnings had declined. That allegation suffices to establish a class

period ending on August 1, 1994; limiting that period to July 27, 1994, when the last named plaintiff purchased Newbridge shares, would be "arbitrary."

Federal Rule of Civil Procedure 23(c)(1) permits this Court to conditionally grant plaintiffs' motion for class certification and provides that an order with respect to class certification "may be altered or amended before the decision on the merits." As discussed above, defendants argue that plaintiffs have alleged insufficient information to justify class certification. An accompanying Order will grant plaintiffs' motion for class certification on a conditional basis, without prejudice to renewal of defendants' objections at the close of discovery. At that time, this Court may reconsider whether the class should be certified and whether the named plaintiffs will fairly and adequately represent the class.

## VII.

On March 13, 1996, defendants filed a motion for an order pursuant to Federal Rules of Civil Procedure 26(c), 26(d), 26(g)(3), and 37(a)(4) directing that the depositions sought by plaintiffs pursuant to their Notice of Depositions dated February 16, 1996, be had only under certain conditions. One of those conditions is that the requested depositions should be held, if at all, only after decision on the motion to dismiss. Plaintiffs have filed a cross-motion to compel discovery. The ruling on defendants' motion to dismiss obviously moots this issue.

In their motion, defendants specify several other conditions which do not relate to the motion to dismiss. Defendants argue that the requested depositions should be held, if at all, (1) only in the city of residence of the person sought to be deposed, or at such other place as the deponent may agree; and (2) with respect to any non-party, only after plaintiffs comply with the procedures for the taking of testimony in Canada from Canadian citizens pursuant to Federal Rule of Civil Procedure 28(b) and any other applicable law. Defendants also request attorneys' fees and costs. In their Cross–Motion, plaintiffs note that defendants' argument regarding

the location of the depositions is moot, as plaintiffs have agreed to conduct the depositions in Canada. In addition, plaintiffs represent that they have served an Amended Notice of Deposition, so that defendants' arguments with respect to the adequacy of the deposition notice are also moot. In their Reply, defendants effectively concede that their arguments about the location of the depositions and the adequacy of the notice are moot, although they maintain that "there is still no reason why the examinations [plaintiffs] seek should not await the resolution of Defendants' pending motion to dismiss." Defs.' Reply at 1. Accordingly, an accompanying Order will deny the parties' pending discovery motions as moot.

## ORDER

For the reasons stated in the accompanying Memorandum, it is this 3rd day of June, 1996, hereby

ORDERED: that defendants' motion (22–1) to dismiss plaintiffs' claim of securities fraud should be and is hereby GRANTED IN PART AND DENIED IN PART; and it is further

ORDERED: that, with the exception of the allegations relating to deficiencies in Newbridge's 36150 ATMnet switch and undisclosed delays in shipping contracts because of inadequate inventory, plaintiffs' allegations of securities fraud should be and are hereby DISMISSED with leave to amend; and it is further

ORDERED: that defendants' motion (22–1) to dismiss plaintiffs' claim of "controlling person" liability against the individual defendants should be and is hereby DENIED; and it is further

ORDERED: that defendants' motion (22–1) to dismiss plaintiffs' common-law negligent misrepresentation claim should be and is hereby GRANTED; and it is further

ORDERED: that plaintiffs' common-law negligent misrepresentation claim should be and is hereby DISMISSED WITH PREJUDICE; and it is further

ORDERED: that plaintiffs may serve and file their Second Amended Consolidated Complaint *on or before July 3, 1996*; and it is further

ORDERED: that defendants may, *on or before July 22, 1996*, renew their motion to dismiss the Second Amended Complaint for failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b); and it is further

ORDERED: that plaintiffs' motion (13–1) for class certification should be and is hereby CONDITIONALLY GRANTED without prejudice to renewal of defendants' objections to class certification at the close of discovery; and it is further

ORDERED: that this action should be and is hereby conditionally certified under Federal Rule of Civil Procedure 23(c)(1) on behalf of all persons who purchased the common stock of Newbridge Networks Corp. ("Newbridge") between March 29, 1994 and August 1, 1994 (the "class period") inclusive, and who were damaged thereby ("the class"). Excluded from the class are the defendants in this action, members of the immediate families of the individual defendants, any entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, heirs, successors-in-interest, or assigns of any such excluded party. The parties shall present to the Court, on or before *July 3, 1996,* a proposed Order directing Class Notice and a form of Notice of the Pendency of this Action to the members of the class. It is further

ORDERED: that defendants' motion (41–1) for an order pursuant to Federal Rules of Civil Procedure 26(c), 26(d), 26(g)(3), and 37(a)(4), and plaintiffs' cross-motion (42–1) to compel discovery, should be and are hereby DENIED AS MOOT; and it is further

ORDERED: that a status conference to schedule further administration of this case shall be held on July 12, 1996, at 10:00 a.m., in Courtroom No. 3.