In re NEWBRIDGE NETWORKS SECURITIES LITIGATION.

Civil Action No. 94–1678–LFO.

United States District Court, District of Columbia.

April 10, 1997.

Cohen Milstein Hausfeld & Toll, Washington, DC, Abbey & Ellis, New York City, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Goodkind, Labaton, Rudoff & Sucharow, New York City, for plaintiffs.

Hunton & Williams (Christopher M. Mason, James E. Farnham, of counsel), New York City, for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiffs are stockholders and former stockholders of defendant Newbridge Networks Corp., a Canadian corporation that designs, makes, and markets integrated digital networking products for global networking applications, including ATM systems used by banks. The Second Amended Consolidated Complaint names Newbridge and the following individual defendants: Newbridge's founder, Chairman of the Board, and CEO, Terence H. Matthews; its President, COO, and a director, Peter Sommerer; and its Executive Vice–President, Finance, and CFO, Peter D. Charbonneau. Seven different class action cases have been consolidated into this one class action.

## I.

Plaintiffs Amended Complaint alleged that defendants made false and misleading statements concerning the business condition and earnings prospects of Newbridge. It asserted that plaintiffs lost money as a result of purchasing Newbridge stock because defendants failed to disclose substantial expenses and decreased profit margins. Plaintiffs sought damages on three counts: (i) a claim for "fraud on the market" against all defendants pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5; (ii) a claim for "controlling person" liability against the individual defendants pursuant to § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a); and (iii) a common law claim for "negligent misrepresentation."

A June 3, 1996 Memorandum and Order granted in part and denied in part defendants' motion to dismiss plaintiffs' complaint. *In re Newbridge Networks Securities Litigation*, 926 F.Supp. 1163 (D.D.C.1996) ("*Newbridge*"). *Newbridge I* (i) dismissed, with leave to amend, plaintiffs' allegations of securities fraud, with the exception of the allegations relating to deficiencies in Newbridge's 36150 ATMnet switch and undisclosed delays in shipping contracts because of inadequate inventory; (ii) denied defendants' motion to dismiss plaintiffs' claim of "controlling person" liability against the individual defendants; (iii) granted, with prejudice, defendants' motion to dismiss plaintiffs' common law negligent misrepresentation claim; (iv) ordered that plaintiffs may file a Second Amended Complaint to which defendants may renew their motion to dismiss for failure to plead fraud with particularity as required by Fed.R.Civ.P. 9(b); (v) denied as moot cross-motions to compel discovery; (vi) granted plaintiffs' motion for class certification without prejudice to defendants' renewal of any objections to class certification at the close of discovery; and (vii) conditionally certified the class under Fed.R.Civ.P. 23(c)(1) on behalf of all persons who purchased the common stock of Newbridge between March 29, 1994 and August 1, 1994 ("Class Period").

Plaintiffs filed a Second Amended Complaint ("SAC") on July 3, 1996. It alleges (i) a claim for "fraud on the market" against all defendants pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5; and (ii) a claim for "controlling person" liability against the individual defendants pursuant to § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). Defendants filed a *motion to dismiss the Second Amended Complaint for failure to plead fraud with particularity*. Plaintiffs opposed and defendants replied.

## II.

■ Defendants' motion to dismiss the Second Amended Complaint examines each allegation of fraud individually to determine whether it is plead with the particularity required by Rule 9(b). Plaintiffs argue, however, that the allegations of fraud should not be considered on an individual basis, but rather should be considered jointly. Opp. at 12–13; Pl. Citation of Supplemental Authorities, citing *Isquith v. Middle South Util., Inc.*, 847 F.2d 186 (5th Cir.1988); *Robbins v. Moore Medical Corp.*, 788 F.Supp. 179, 183 (S.D.N.Y.1992). Both of these cases are inapposite because they analyze the requirements for motions to dismiss under Fed. R.Civ.P. 12(b) or for summary judgment under Fed.R.Civ.P. 56. Neither analyze the requirements for motions to dismiss under Fed.R.Civ.P. 9(b). In addition, in context, the cases do not support plaintiffs' claim. *Robbins'* statement that "the sufficiency of the allegations is considered jointly" was made in a discussion as to whether the company at issue there had a duty to disclose information to investors concerning its business condition. *Robbins* noted that allegations about optimistic statements and allegations about material omissions would be "considered jointly" in determining whether such a duty existed. *Robbins* did not state that a collection of indefinite allegations, "considered jointly," may be sufficiently particular for Rule 9(b). Moreover, the text of Rule 9(b) plainly states that "*all* averments of fraud" must be pleaded with particularity, not just "some" or "many." Rule 9(b) is "a strict pleading standard." *Newbridge I*, 926 F.Supp. at 1173. In *Kowal v. MCI Commu-*

*nications Corp.*, 16 F.3d 1271 (D.C.Cir.1994), a case upon which both parties heavily rely, the district court and court of appeals examined the particularity of each allegation of fraud individually. Thus, this Memorandum does the same.

Plaintiffs also argue that Rule 9(b) merely requires "sufficient detail to put defendants on adequate notice of the claims being made against them." Opp. at 15. Defendants disagree, pointing out that if that were the case, "Rule 9(b) would clearly be superfluous if its only function were to insure that defendants are provided with the degree of notice which is already required by Rule 8(a)." Reply at 3. *Kowal* supports defendants' contention. *Kowal* restated the texts of Rules 8 and 9(b) and then stated: "Reading these two provisions in conjunction 'normally ... means that the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud.'" *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1278 (D.C.Cir.1994), citing *United States v. Cannon*, 642 F.2d 1373, 1385 (D.C.Cir.1981).

### III.

Fed.R.Civ.P.9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud ... shall be stated with particularity." Plaintiffs "must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Kowal*, 16 F.3d at 1278 (internal quotation marks and citation omitted). In addition, "where plaintiffs seek to base a claim of securities fraud on false and misleading projections or statements of optimism, their complaint must also plead sufficient facts that if true would substantiate the charge that the company lacked a reasonable basis for its projections or issued them in less than good faith." *Id.* A motion to dismiss should not be granted "unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." *Id.* at 1276. While plaintiffs are granted the benefit of all inferences that can be derived from the facts alleged, "the

court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Id.*

The Second Amended Complaint includes allegations concerning: (i) security analysts; (ii) orders that did not ship; (iii) declining sales; and (iv) increased expenses. The following analyzes plaintiffs' allegations in these contexts to determine whether they are plead with the particularity required by Rule 9(b).

### A. Allegations Concerning Security Analysts

Plaintiffs allege that numerous analyst reports evidence defendants' misrepresentations and material omissions intended to mislead the market. *Newbridge I* held that these allegations were deficient because (i) plaintiffs had not alleged "adoption" or "endorsement" of the analyst reports with sufficient particularity; and (ii) plaintiffs allegations were not sufficiently particular as to the "time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Kowal*, 16 F.3d at 1278; *see Newbridge I*, 926 F.Supp. at 1171–72. The Second Amended Complaint attempts to remedy these deficiencies.

### 1. *New Generic Adoption Allegations*

*Newbridge I* held that "plaintiffs' conclusory allegation with respect to endorsement is inadequate under Rule 9(b)." *Id.* at 1172. "A company may be liable for analysts' forecasts which it fostered and reviewed but failed to correct if it expressly or impliedly represented that the information was accurate or coincided with the company's views.... Allegations based on this theory of liability must legally support a conclusion that the company adopted, endorsed or sufficiently entangled itself with the forecasts to render them attributable to him." *Newbridge I*, 926 F.Supp. at 1173, citing *In re Syntex Corp. Sec. Litig.*, 855 F.Supp. 1086, 1097 (N.D.Cal.1994) *aff'd*, 95 F.3d 922 (9th Cir.1996). *Newbridge I* also stated that "[p]laintiffs must also allege that defendants had some measure of control over the con-

tent of the final report or projection issued by the analysts. . . . Analysts might quote corporate spokespersons out of context or inaccurately interpret remarks made by corporate insiders." *Newbridge I,* 926 F.Supp. at 1171; *see also Raab v. General Physics Corp.,* 4 F.3d 286, 288–89 (4th Cir.1993) (dismissing complaint for failure to plead "how [defendant] could have controlled the content of the statement"); *In re Syntex Corp. Sec. Litig.,* 855 F.Supp. at 1097; *In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1237 (N.D.Cal.1994) (citations omitted).

■ Plaintiffs include the following three generic allegations in the Second Amended Complaint in an attempt to redress this deficiency. First, plaintiffs now allege that "[d]efendants both endorsed the content of reports and projections issued [sic] analysts and exercised considerable control over their content because Newbridge was the principle [sic] source of information for such reports and projections." SAC ¶ 27. *Newbridge I* rejected the sufficiency of such a "rather general allegation of endorsement," 926 F.Supp. at 1172, stating that "[i]t is not sufficient to allege that defendants provided analysts with the information on which the analysts' reports were based." *Id.* at 1171, quoting *In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1237 (N.D.Cal.1994).

Second, plaintiffs now allege that analysts visited "Newbridge's headquarters in Kanata" at unspecified times. SAC ¶ 30. This paragraph does not state what took place during the visits or when they occurred. *See In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1097 (N.D.Cal.1994) (citations omitted), *aff'd,* 95 F.3d 922 (9th Cir.1996); *Hammerman v. Peacock,* 607 F.Supp. 911, 916 (D.D.C.1985) (noting that a securities fraud plaintiff must specify "the time and place of each such statement").

Third, plaintiffs now allege that James Marshall, head of Newbridge's Investor Relations department, had various contacts with unspecified analysts who told him "their earnings projections." SAC ¶ 31. In addition, Mr. Marshall allegedly "express[ed] a range of numbers," SAC ¶ 31 in response to the projections. Plaintiffs do not specify the period or periods covered by those projec-tions. Plaintiffs also do not specify the range Mr. Marshall expressed, or what the range represented. Similarly, plaintiffs now claim that "[a]fter the end of a quarter, Marshall would typically comment about the current consensus of analysts' earnings estimates and would indicate whether Newbridge was comfortable with that range." SAC ¶ 32. Plaintiffs do not specify where, how, or by whom such a "current consensus" was reached; what its form may have been; or whether Mr. Marshall agreed with that "current consensus" on any particular date. Such allegations are inadequate for purposes of Rule 9(b).

### 2. *New Specific Allegations About Securities Analysts*

The Second Amended Complaint includes allegations about analysts from the following companies: Gordon Capital Corporation, S.G. Warburg & Co. Inc., CS First Boston Corporation, Alex. Brown & Sons Incorporated, and Nutmeg Securities, Ltd.; and allegations about a story in Toronto's *Financial Post.* None of these new allegations satisfy the pleading standards prescribed by *Newbridge I* and Rule 9(b).

■ (a) *Plaintiffs' new allegations about Gordon Capital analysts.* Plaintiffs have added several allegations to the Second Amended Complaint about analyst reports from Gordon Capital Corporation ("Gordon Capital"). According to plaintiffs, an April 20, 1994 report prepared by an unspecified Gordon Capital analyst states that " '[a]fter discussion with management, we continue to believe in the fundamentals of the Company. We are forecasting EPS of U.S. $0.41 to U.S. $0.42 for Q4/94 . . . .' " SAC ¶ 52(a). This allegation is insufficiently particular because it fails to (i) identify the name of the analyst or the names of the management; (ii) allege "adoption" by not specifying whether Gordon Capital disclosed this report to anyone at the Company, or whether anyone agreed with it.

■ Another April 20, 1994 report by an unspecified author at Gordon Capital allegedly states that " '[o]ur recent discussion with the Company indicates that business continues to be very strong . . . . We understand

that Newbridge continues to win major contracts, particularly in Europe. The aggregate amount for European contracts is over $100 million.... We are reiterating our buy on Newbridge Networks.'" SAC ¶ 52(a). This allegation fails because the "recent discussion" fails to specify the time, place, and content of the misrepresentation and does not include any indication of post-statement involvement between anyone at Newbridge and anyone at Gordon Capital about this report. Thus, the statement could have been "taken out of context, incorrectly quoted, or stripped of important qualifiers." *Raab v. General Physics Corp.*, 4 F.3d 286, 288–89 (4th Cir.1993).

■ In addition to these two April reports, plaintiffs allege that Lap Y. Lee of Gordon Capital reported on June 8, 1994:

> Newbridge management is extremely impressed by the overwhelming interest in their ATM products. The company continues its strong efforts in ATM development. Management believes ATM will revolutionize communications over the next 10 years and become the common building block for all forms of telecommunications in the 1990s.

SAC ¶ 58(d).

These allegations fail to identify who at Newbridge held these beliefs or when these beliefs were expressed to the Gordon Capital analyst. These allegations also do not indicate whether any representative of the Company maintained any post-statement involvement or control with respect to the statement. These allegations, therefore, do not satisfy the requirements of Rule 9(b).

■ (b) *Plaintiffs' new allegations about S.G. Warburg analysts.* Plaintiffs allege that Robert H. Kim, formerly of S.G. Warburg & Co. Inc. ("S.G.Warburg") sent James Marshall, head of Newbridge's Investor Relations Department, "a copy of his spreadsheet model ... so that Marshall would have it before him if Kim asked a question regarding an earnings projection." SAC ¶ 31. This allegation is too indefinite because it fails to specify the time in which this event allegedly occurred. Plaintiffs also do not allege that Mr. Kim ever actually talked to Mr. Marshall

about earnings, or that Mr. Marshall ever made a statement that Mr. Kim reported. Plaintiffs also do not allege that the spreadsheet model, which Mr. Marshall allegedly endorsed, contained inaccuracies or any other misinformation that Mr. Marshall should have corrected.

■ (c) *Plaintiffs' new allegations about First Boston analysts.* Many of plaintiffs' new allegations concern contacts between James Patrick Parmalee of CS First Boston Corporation ("First Boston") and James Marshall, head of Newbridge's Investor Relations department. Plaintiffs allege:

> Marshall would give Parmalee "a general guidance level with which Newbridge was comfortable" when Mr. Parmalee called to discuss published earnings projections.

SAC ¶ 32.

This allegation lacks specificity because it does not allege when the guidance was given or what the range of Mr. Marshall's guidance might have been. Defendants correctly point out that Mr. Marshall's guidance may have been that Mr. Parmalee was consistently wrong.

Plaintiffs also allege:

> On March 1, 1994, Marshall told Parmalee during a telephone call that he was "comfortable" with analyst estimates for the first fiscal quarter of 1995; that earnings estimates for fiscal 1995 in the range of $2.10 were appropriate; and that estimates in the range of $2.15 were beginning to be too aggressive.

SAC ¶ 33(a).

■ Mr. Marshall's alleged statement to Mr. Parmalee on March 1, 1994, that he was "comfortable" with unspecified analyst "estimates" "for the first fiscal quarter of 1995," SAC ¶ 33(a), fails to specify what, in fact, the analysts "estimates" were. *See, e.g., Hammerman*, 607 F.Supp. at 916 (plaintiff must specify "the content of ... statements"). Nor does this statement allege any post-statement control. Finally, the statements about the analysts' estimates being "appropriate" or "too aggressive" are also insufficient. Projections of future performance are generally actionable under § 10(b) and Rule 10b–5 "only if they are supported by specific

statements of fact or are worded as guarantees." *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir.1994). There is no allegation that Mr. Marshall used such positive words here. In *Malone,* the Fourth Circuit examined the claim of certain stockholders that seven company statements constituted violations of § 10(b) and Rule 10b–5. The district court entered judgment as a matter of law for the company, holding that the plaintiffs had presented no evidence that any of the seven statements were false or misleading. *Malone v. Microdyne Corp.,* 824 F.Supp. 65, 66, 68 (E.D.Va.1993). The court of appeals reversed, concluding that there was a sufficient evidentiary basis upon which a jury could find that six of the seven statements were false or misleading. *Malone,* 26 F.3d at 478–79. In each of these six statements, the company booked and reported items as sold, never disclosing that, in fact, it had given distributors the right to return them. *Id.* at 473. The court of appeals affirmed, however, with respect to the seventh statement, in which the company did not make any comments as to past or present sales. Rather, the company president stated, in response to a press inquiry, that he "was comfortable with" an analyst's earnings estimate that the Company would earn 80 cents per share in the 1992 fiscal year, which would end in seven months, and $1.05 per share in the 1993 fiscal year, an increase from the 76 cents per share that the company had earned in fiscal year 1991. *Id.* This prediction did not become reality. The court of appeals held, nevertheless, that it was not actionable as a matter of law because it was neither worded as a guarantee nor "specific enough to perpetrate a fraud on the market." *Id.* at 479–80. It explained: "Misstatements or omissions regarding actual *past* or *present* facts are far more likely to be actionable than statements regarding projections of *future* performance. Generally the latter will be deemed *actionable under* § 10(b) and Rule 10b–5 only if they are supported by specific statements of fact or are worded as guarantees." *Id.* at 479 (emphasis in original). Thus, Mr. Marshall's alleged statement to Mr. Parmalee on March 1, 1994, that he was "comfortable" with unspecified analyst "estimates" for the first fiscal quarter of 1995, is

not actionable because it, too, is not "specific enough to perpetuate a fraud on the market" nor worded as a guarantee. *Id.*

■ The new allegations about a May 26, 1994 report contain similar defects. Mr. Parmalee wrote: " 'Are the good times over? We believe the answer is no. For its fourth fiscal quarter of fiscal 1994 and first quarter of fiscal '95, we suspect Newbridge's earnings performance will be in line with our earnings projections.' " SAC ¶ 52(b). According to plaintiffs, Mr. Parmalee recalls that "these opinions were based on multiple sources, including conversations with Newbridge management." SAC ¶ 52(b). The uncertain reference to "multiple sources" and unspecified "conversations" renders these allegations inadequate under Rule 9(b). *See, e.g., United States ex rel Joseph v. Cannon,* 642 F.2d 1373, 1385–86 (D.C.Cir.1981). In addition, plaintiffs have once again failed to allege any post-statement involvement between Mr. Parmalee and any of those "multiple sources" concerning his report.

Finally, plaintiffs also allege that Mr. Parmalee made the following notations after a June 7, 1994 telephone call with Mr. Marshall: "$2.10 range based 42 cents." SAC ¶ 33(d). Plaintiffs do not allege that First Boston ever published such an estimate or whether Mr. Marshall agreed or disagreed with Mr. Parmalee's notation. There is no allegation that Mr. Parmalee told Mr. Marshall those figures. Thus, this allegation also does not plead the circumstances of any fraud with particularity.

(d) *Plaintiffs' new allegations about Alex. Brown analysts.* The Second Amended Complaint now contains allegations that Mr. Marshall had "numerous" contacts with Nicholas P. Coutros of Alex. Brown & Sons Incorporated ("Alex.Brown"). It alleges that Mr. Marshall discussed "the reasonableness of the assumptions upon which" Mr. Coutros estimated earnings for some unspecified period or periods. SAC ¶ 34. These allegations are also deficient. While Mr. Coutros allegedly "received input from Newbridge concerning forecasts he attempted to make," SAC ¶ 34, plaintiffs do not specify what that input may have been, or what Mr. Coutros actually forecast. While it may have been

Mr. Coutros' "normal practice to speak to Marshall after conference calls to discuss his assumptions and obtain guidance from him," SAC ¶ 34, plaintiffs do not indicate what those assumptions may have been or what the "guidance" was.

Where plaintiffs specify a date of contact between Mr. Coutros and Mr. Marshall, their allegations lack particularity in other important respects. Plaintiffs now allege that "[o]n February 15, 1994, Coutros told Marshall after an earnings release conference call that he was raising his revenue and earnings per share estimates" for some unspecified period or periods. SAC ¶ 35(a). Plaintiffs do not identify the amounts by which Mr. Coutros supposedly raised his estimates. Plaintiffs do not allege what, if anything, Mr. Marshall might have said in reply to Mr. Coutros. Again, Mr. Marshall may have disagreed with those estimates.

Other allegations with respect to contact between Mr. Marshall and Mr. Coutros include:

(i) Marshall and Coutros "discussed earnings estimates for the quarter" (the fourth quarter of fiscal 1994) on April 28, 1994. SAC ¶ 35(c).

(ii) On April 19, 1994, Mr. Coutros made the following notes "premised on information given him by Marshall" in a telephone call: "'Ahead of order target; Margins, balance sheet, all look good'; and 'Could live with $2.20 for FY 95.'" SAC ¶ 35(b).

(iii) Coutros notes of a May 30, 1994 telephone call with Marshall state: "Will do $100 million ATM sales this fiscal year '95, April, $20 million in vivid with two corporate clients." SAC ¶ 35(d).

Plaintiffs again fail to state whether Mr. Marshall agreed or disagreed with anything Mr. Coutros said. Furthermore, while plaintiffs allege that Mr. Marshall discussed these or other annual projections of earnings, or of sales of particular products, see, e.g., SAC ¶¶ 33(c), they do not claim that any annual projections were false, misleading, or even unreasonable.

Finally, while plaintiffs now allege that "Alex Brown reiterated its 'strong buy' rating based on information presented by New-bridge management during the June 7, 1994 conference call," SAC ¶ 58(b), nowhere do they allege if, when, where, how, or with whom Mr. Coutros ever discussed this rating. Plaintiffs have not alleged that any particular report by Mr. Coutros contains anything specific discussed with Mr. Marshall, or that in any particular instance Mr. Coutros had any post-statement contact with anyone at New-bridge concerning anything he reported.

(e) *Plaintiffs' new allegations about Nutmeg analysts.* In the Second Amended Complaint plaintiffs allege that Mr. Marshall had "numerous" contacts with Andrew Scho-pick of Nutmeg Securities, Ltd. ("Nutmeg"). SAC ¶ 36. "Schopick would send Marshall his earnings forecasts and models (and did so in May or June of 1994) and received guidance from Marshall with regard to his estimates." SAC ¶ 36. Plaintiffs do not allege what those "forecasts and models" said, and what Mr. Marshall's "guidance" was. Nor do plaintiffs specify the date of any contact between Mr. Schopick and Mr. Marshall. Alleging a time frame of several months, which is all plaintiffs have done, see SAC ¶ 36, does not satisfy Rule 9(b). See, e.g., Abbott Chems., Inc. v. Emco Eng'g. Inc., No. 93–2018(JP), 1994 WL 759232, at * 3, 1994 U.S. Dist. LEXIS 19622, at *7 (D.P.R. Dec. 5, 1994).

Similarly, plaintiffs' allegation that Mr. Schopick "*may* have spoken with Marshall in *June or July* of 1994 and was told on this occasion that the Company was 'on track' for the first fiscal quarter and was not expecting any surprises," SAC ¶ 36 (emphasis added), is indefinite as to whether and when the conversation occurred.

(f) *Plaintiffs' new allegations about the Financial Post story.* Plaintiff's allegations about a July 12, 1994 story in Toronto's *Financial Post* remain insufficiently particular for purposes of Rule 9(b). In this article, a reporter purported to quote Sandra Plumley of Newbridge. See SAC ¶ 62. Plaintiffs' essential allegations about Ms. Plumley's alleged failure to disclose negative information remain unchanged. *Compare* AC ¶ 59 *with* SAC ¶ 62. Plaintiffs' responded by adding a single sentence claiming that Ms. Plumley "failed to disclose the adverse

facts concerning Newbridge's business and future prospects that were known or recklessly disregarded by defendants." SAC ¶ 62. Plaintiffs allege no post-statement involvement with Ms. Plumley or anyone else at Newbridge concerning the story. This new sentence, therefore, does not alter the conclusion of *Newbridge I* that these allegations are "clearly insufficient under Rule 9(b)." *Newbridge I*, 926 F.Supp. at 1173.

### B. Allegations About Orders that Did Not Ship

■ In the Amended Complaint, plaintiffs alleged that positive public statements made by Newbridge were misleading because the Company did not disclose that it could not ship certain orders to certain customers in the first quarter of its fiscal 1995 because Newbridge could not "obtain financing guarantees from third-party banks" for them. AC ¶ 69(a)(ii). *Newbridge I* dismissed those allegations because they did not (i) identify the customers; (ii) identify the third-party banks; or (iii) satisfy the *Kowal* standard for pleadings on information and belief. *Newbridge I*, 926 F.Supp. at 1173 (noting that in the absence of additional facts, plaintiffs must allege that such facts are within defendants' control and provide a statement of facts on which the allegations are based).

Plaintiffs now identify the customers who had financing problems as Hebei, the Bank of China, Vodatel, and Compania Anonima de Telefonos de Venezuela ("CANTV"). SAC ¶ 72(a)(ii). Plaintiffs, however, concede that they still have not "identif[ied] which specific [third-party] banks refused to provide financing for the Hebei, the Bank of China, and Vodatel orders." Opp. at 20. Plaintiffs argue that they need not identify these banks because "the Court did not require that each contract had to have the same level of specificity." *See* Opp. at 15, 19. This assertion is incorrect. Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In addition, *Newbridge I* stated that "this strict pleading standard under Rule 9(b) is intended to 'prevent the filing of a complaint as a pretext for the discovery of unknown wrongs.'" *Newbridge I*, 926 F.Supp. at 1173, citing *Kowal*, 16 F.3d at 1279 n. 3. Tolerating loosely plead allegations encourages just this result. Plaintiffs' allegation, therefore, that Newbridge did not ship orders to Hebei, the Bank of China, and Vodatel in the first quarter of its fiscal 1995 because Newbridge could not obtain financing guarantees from third-party banks does not satisfy the requirements of Rule 9(b).

■ Plaintiffs, however, do provide the names of two third-party banks with respect to the CANTV order. *See* SAC ¶ 72(a)(ii). These banks are identified as the Bank of Montreal and the Confederation Andina de Fomento, an Andean multilateral agency. Thus, plaintiffs' allegation that Newbridge did not ship orders to CANTV in the first quarter of its fiscal 1995 because Newbridge could not obtain financing guarantees from the Bank of Montreal and the Confederation Andina de Fomento does satisfy Rule 9(b). Plaintiffs are not required to allege the "amount" of the contract, contrary to the defendants' argument. Nor are any other specifying details needed to bring these allegations into compliance with Rule 9(b). Plaintiffs have complied with *Newbridge I* by providing the specific information with respect to the CANTV order that was previously lacking. That allegation is now pleaded with the particularity required by Rule 9(b).

■ Defendants also seek reconsideration of the decision in *Newbridge I* that plaintiffs' allegation regarding shipping delays due to inadequate inventory was plead with particularity. Newbridge stated in a Form 10–K that it "has not experienced any significant delays relating to the availability of materials." The Second Amended Complaint alleges that the Company failed to disclose that it could not ship orders "in complete form because Newbridge lacked the right parts in its inventory." *Newbridge I* determined:

> While those contracts are not specifically identified, plaintiffs do specifically allege that the identity of the contracts Newbridge was unable to ship is "particularly within defendants' knowledge." *Id.* ¶ 69. Moreover, it appears from the Amended

Complaint that plaintiffs base their allegation with respect to shipment delays on a statement by Kenneth Wigglesworth, Newbridge's Vice–President of Finance, after the August 1, 1994 announcement of decreased earnings, that Newbridge "was unable to fill some shipments because inventories of certain parts were not available." *Id.* Although it is a close question, plaintiffs satisfy the *Kowal* standard with respect to allegations about undisclosed delays in shipping contracts because of inadequate inventory.

*Newbridge I,* 926 F.Supp. at 1173.

Defendants now argue that "despite the production of thousands of pages of documents from Newbridge and others, plaintiffs still allege that they cannot provide any detail at all about these other orders," and thus "this bare allegation no longer satisfies Rule 9(b)." Defendants' argument must fail. Plaintiffs have alleged on information and belief that certain information is "particularly within defendants knowledge," and have pointed to specific information justifying that belief. Such a showing complied with *Kowal* earlier and it still complies with *Kowal* now. *See, e.g., Kowal,* 16 F.3d at 1279 n. 3. *Kowal* does not stand for the proposition that additional discovery encumbers a plaintiff with the burden of pleading with greater particularity than that prescribed by Rule 9(b).

C. Allegations about Flat or Declining Sales

■ Plaintiffs allege that defendants made positive statements about the sales of its products that were misleading in light of flat and declining sales. At a March 29, 1994 meeting with security analysts, for example, defendants told the analysts that the Company would experience "no significant deterioration in its current profit margins" with regard to the ATM market and that demand in the carrier market for the Company's ATM switch "outpaced expectations." SAC ¶ 49. In addition, on June 7, 1994, defendant Sommerer stated during a conference call:

So the numbers definitely look very, very good. The numbers, combination of *continued very strong demand for product. all the product lines, I think all the product lines increased,* increasing revenues. . . .

We see very little pricing pressure on those and *demand keeps building* as new major networks . . . start to continue to expand the metric size as services are being picked up by end users.

SAC ¶ 55 (emphasis added).

Plaintiffs argued in the Amended Complaint that positive statements about the Company's sales were misleading in light of the Company's failure to disclose that sales in Newbridge's T–1 multiplexer product line, representing 73% of the Company's sales, "were flat or declining, in contrast with prior reporting periods," AC ¶ 69. *Newbridge I,* 926 F.Supp. at 1173. *Newbridge I* concluded that this claim did not satisfy Rule 9(b) because plaintiffs failed to allege (i) the degree to which such sales were flat or declining, or (ii) the relevant time period. Plaintiffs attempt to cure each of these deficiencies in the Second Amended Complaint.

Several new allegations within the Second Amended Complaint fail to specify either the *degree* to which sales were flat or declining or the relevant *time period.* For example, plaintiffs allege that as early as March 24, 1994, an internal presentation entitled "Key Issues" highlighted that "US Prospects Continues to *Decline,*" but does not specify the degree of decline. SAC ¶ 72(a)(iii) (emphasis added). Additionally, plaintiffs allege that "the Executive Committee of Newbridge reached a consensus in a meeting on May 19, 1994, that the first fiscal quarter of 1995 would show *slower* order growth over the fourth quarter of 1994," and that the Board of Directors was informed that "there was some evidence of order growth *slowdown.*" SAC ¶ 72(a)(iii) (emphasis added). Such descriptions are only marginally more particular than the original allegation that sales in the T–1 multiplexer line were "*flat* and *declining* in contrast with prior reporting periods" (emphasis added), that was rejected by *Newbridge I.*

Some of plaintiffs' other new allegations about declining sales either fail to satisfy Rule 9(b) or are largely irrelevant. First, plaintiffs' claim that a "deterioration in sales" in May and June 1994 produced a "large increase in Newbridge's inventory." SAC ¶ 72(a)(iii). Plaintiffs do not specify the size

of this "increase." They simply cite an undated Newbridge document that notes that "inventory appears to grow without bound." SAC ¶ 72(a)(iii). This lack of detail does not contain enough detail to satisfy the requirements of Rule 9(b). Second, plaintiffs' allegations about "declining sales" in August 1994 are largely irrelevant because they are beyond the Class Period. *See* SAC ¶ 72(a)(iii) (noting minutes of an August 18, 1994 Executive Committee meeting which indicate that the Company had reduced its revenue target for the second fiscal quarter and that two defendants had suggested that fiscal 1995 Q2 revenue performance would be flat with Q1).

In addition, plaintiffs now allege that "[a] significant contributing factor behind Newbridge's revenue decline was inadequate customer service." SAC ¶ 72(a)(iii), citing a May 26, 1994 memorandum in which Brian NeSmith stated his views on "customer perceptions of our service." SAC ¶ 72(a)(iii). While Mr. NeSmith apparently believed that "service issues are beginning to slow the growth of the company and will have a substantial affect [sic] going forward unless we make a major change," SAC ¶ 72(a)(iii), plaintiffs do not allege the amount of any such effect on revenue. Nor do plaintiffs indicate whether Mr. NeSmith held a management position in the Company or whether anyone in management shared his views. Plaintiffs also fail to point to any affirmative statements that, in light of these omissions, are misleading. Such allegations do not comply with Rule 9(b). *See, e.g., Kowal,* 16 F.3d at 1278; *Newbridge I,* 926 F.Supp. at 1172.

■ Other new allegations concerning flat or declining sales, nevertheless, are sufficiently particular in that they specify the "relevant time period" and "degree" of the diminished sales. These statements include allegations that: (i) "a Newbridge finance report generated in June 1994 also acknowledged that '[s]ales for the month of June were $44M, which was 16M below budget.

On a quarter to date basis, sales are $69M versus a budget of $103M' "; (ii) a July 15, 1994 Income Statement Analysis stated that "during the months of May and June 1994, two thirds of the way through the first fiscal quarter of 1995, product sales were 32.7% behind budget; gross margin was 6.1% behind budget; and net earnings were 92% behind budget"; and (iii) Bruce Rogers stated at a June 3, 1994 Newbridge Executive meeting[1] that "prospects for Q1 business indicated that order intake for Q1 would be flat with Q4." SAC 72(a)(iii). A trier of fact could find that the Company's failure to disclose this data constituted an omission "to state a material fact necessary in order to make the statements made [concerning increased sales] ... not misleading." Rule 10b–5.

■ Defendants argue that even if some of plaintiffs new allegations are plead with particularity, these allegations should be dismissed · because defendants allege that the market already knew that the percentage rate of order growth was declining. Defendants cite a May 26, 1994 report by First Boston analysts that projected a decreased growth rate for fiscal 1995 as opposed to fiscal 1994. This "truth on the market" defense must fail as a ground for dismissing the complaint at this time.[2] First, the Second Amended Complaint cites numerous instances after the First Boston report was issued in which defendants made positive public statements without acknowledging the continued problems with growth. Second, a change in one analyst's growth estimates does not mean that the market knew all of the material undisclosed facts concerning the problems the Company was having. Courts have emphasized that a "truth on the market defense" is effective only where defendants can demonstrate that the information has "credibly" entered the market through "transmitt[al] to the public with the degree of intensity and credibility sufficient to effec-

---

1. The minutes of that meeting also stated that "[a]ll generally felt that a reduced EPS growth expectations should be communicated to the investment analysts," although plaintiffs allege that Newbridge failed to do so for almost two months. SAC 72(a)(iii).

2. This ruling does not foreclose defendants maintenance of the truth on the market defense at the merits stage of this litigation.

tively counter-balance any misleading impression created by the insiders' one-sided representations." *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1116 (9th Cir.1989). Defendants, therefore, cannot successfully mount a truth on the market defense at this stage of this litigation.

### D. Allegations about Increased Expenses

■ The Amended Complaint alleged that the Company's 10–K—which revealed *declining* research and development expenses as a percentage of the Company's total sales—was false and misleading in light of the fact that Newbridge had experienced "sharply increased" or "materially increased" expenditures. *Newbridge I* dismissed these allegations because they did not specify "the degree to which the expenses increased, or when they increased, or the information on which these allegations are based." *Newbridge I,* 926 F.Supp. at 1173. The Second Amended Complaint cures these deficiencies with some success.

Some of the new allegations in the Second Amended Complaint fail to comply with Rule 9(b) because they still do not specify the degree to which the expenses had increased. Examples include: (i) a statement in an April 1994 internal Finance Report that "R & D spending is expected to *increase*"; (ii) a statement by defendant Matthews that the "ATM program was currently consuming *considerable* R & D"; (iii) a statement by Peter Sommerer that "expenses had grown *too high.*" SAC 72(b)(i) (emphasis added). Likewise, the statement that the Company's U.S. Region had "been mandated to cut $300,000 of expenses in both Quarter 2 and 3" is insufficiently particular because (i) the statement was made after the Class Period; and (ii) plaintiffs fail to identify who made the statement. *Id.*

■ Other statements do survive defendants' motion to dismiss because a trier of fact may determine that the defendants' failure to disclose the information contained in the statements may render misleading defendants public statements on the same subject. A June 1994 Finance Report, for example, stated that:

June operating expenses ran approximately $2.2M over budget with $600K of this variance caused by exchange rates. The remaining variance is focused in NSA advertising and promotional activities. On a quarter to date basis expenses are running $3.2M over budget, with approximately $1.5M of the variance caused by exchange. *Id.*

In addition, the Second Amended Complaint alleges that the Company stated in a July 15, 1994 Executive Committee Meeting that "expenses were reported by the NSA region at $2.2M over budget for the month of June. The majority of the increase in expenses over budget was advertising spending in the NSA region." *Id.* That statement is also sufficient under Rule 9(b). Again, a trier of fact could find that the Company's failure to disclose this data constituted an omission "to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Rule 10b–5.

■ Defendants argue, again, that the market knew that Newbridge's research and development expenses would increase. They argue that in February 1994, well outside the Class Period, the Company told analysts that research and development costs would increase and that one newspaper published this information. Defendants can only point to one published report within the Class Period stating that the Company's research costs would rise. Defendant's truth on the market defense, thus, must fail because a reasonable jury might find that this single report did not constitute a "transmitt[al] to the public with the degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations." *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1116 (9th Cir.1989). Finally, defendants argue that plaintiffs do not allege the "finality" of the projected expenses or counter the possibility that the estimated figures "were subject to revision," citing *In re HealthCare Compare Corp. Sec. Litig.,* 75 F.3d 276, 283 (7th Cir.1996). *HealthCare* is inapposite because there the court found that plaintiffs had "not met their burden to show

that the internal memorandum did not merely contain tentative *projections* subject to revision." *Id.* (emphasis added). Here, however, plaintiffs are not merely alleging informal expense "estimates," but cite several internal memoranda discussing the high level of *existing* expenses. Here, therefore, there is no issue that the actual expenses had grown. The only issue is whether this growth was material, causing their omission to be misleading—a question that cannot be resolved on the pleadings at this stage of this litigation.

### E. Conclusion

■ Finally, defendants reargue other issues resolved by *Newbridge I*, Defendants claim that they were under no duty to disclose the material information plaintiffs allege was concealed. Defendant's criticize *Newbridge I*'s reliance on *Alfus v. Pyramid Technology Corp.*, 764 F.Supp. 598, 603 (N.D.Cal.1991) for the proposition that "whether failure to disclose company problems is an omission causing statements to be misleading is now a factual determination left to the jury." In *Kowal*, our court of appeals stated that "while a company is generally under no obligation to disclose its expectations for the future to the investing public, if the company chooses to volunteer such information, its disclosure must be full and fair, and courts may conclude that the company was obliged 'to disclose additional material facts ... to the extent that the volunteered disclosure was misleading....'" *Id.* at 1277 (internal citation omitted) (citing *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 641 (3d Cir. 1989)). *Craftmatic* states that analysis of Rule 10b–5 claims "begins with two interrelated inquiries. First, were defendants under a duty to disclose the information at issue? Second, were the alleged omissions material?" *Id.* at 641 (citation omitted). *Craftmatic* then recognizes, as does *Kowal* that defendants have a duty to "disclose any material facts that are necessary to make disclosed material statements ... not misleading." *Id.* Thus, the court recognized that "the scope of defendants' disclosure duty is necessarily intertwined with an inquiry into the materiality of the alleged omissions." *Id.* The court then stated that the issue of mate-

riality is a mixed question of law and fact, involving an application of a legal standard to a specific set of facts. "Only when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law." *Id.* (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *see also Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985) ("Materiality is question of mixed law and fact, and a complaint may not properly be dismissed pursuant to Rule 12(b)(6) (or even pursuant to Rule 56) on the ground that the alleged misstatement or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."). Here, as *Newbridge I* determined, plaintiffs have adequately identified a number of positive statements that may be misleading in light of the particular omissions alleged by the Second Amended Complaint. Thus, at this point "a trier of fact could find that several of these omissions bore tangentially, but materially, upon positive statements made by the defendants." *Newbridge I*, 926 F.Supp. at 1169.

Accordingly, an accompanying order grants in part and denies in part defendants' motion to dismiss the Second Amended Consolidated Complaint.

### ORDER

For reasons stated in an accompanying Memorandum, it is this 10th day of April 1997 hereby

ORDERED: that defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART; and it is further

ORDERED: that plaintiffs' allegations concerning security analysts are DISMISSED WITH PREJUDICE; and it is further

ORDERED: that plaintiffs' allegations concerning orders that did not ship for lack of financing guarantees are DISMISSED WITH PREJUDICE, with the exception of the allegation that Newbridge did not ship orders to CANTV in the first quarter of its fiscal 1995 because Newbridge could not obtain financing guarantees from the Bank of

Montreal and the Confederation Andina de Fomento; and it is further

ORDERED: that plaintiffs' allegations concerning flat and declining sales are DISMISSED WITH PREJUDICE with the exception of allegations that:

(i) "[A] Newbridge finance report generated in June 1994 also acknowledged that '[s]ales for the month of June were $44M, which was 16M below budget. On a quarter to date basis, sales are $69M versus a budget of $103M' ";

(ii) a July 15, 1994 Income Statement Analysis, stated that "during the months of May and June 1994, two thirds of the way through the first fiscal quarter of 1995, product sales were 32.7% behind budget; gross margin was 6.1% behind budget; and net earnings were 72% behind budget"; and

(iii) Bruce Rogers stated at a June 3, 1994 Newbridge Executive meeting that "prospects for Q1 business indicated that order intake for Q1 would be flat with Q4"; and it is further

ORDERED: that plaintiffs' allegations concerning increased expenses are DISMISSED WITH PREJUDICE, with the exception of allegations that:

(i) A June 1994 Finance Report stated that: June operating expenses ran approximately $2.2M over budget with $600K of this variance caused by exchange rates. The remaining variance is focused in NSA advertising and promotional activities. On a quarter to date basis expenses are running $3.2M over budget, with approximately $1.5M of the variance caused by exchange; and

(ii) The Company reported at a July 15, 1994 Executive Committee Meeting that "expenses were reported by the NSA region at $2.2M over budget for the month of June. The majority of the increase in expenses over budget was advertising spending in the NSA region."; and it is further

ORDERED: that a status call shall be held on May 5, 1997, at 2:30 p.m. in Courtroom No. 3.